GEORGE M. TRAVER v. BENJAMIN F. SHAEFLE AND
ROBERT M. THOMPSON.

[FILED DECEMBER 18, 1891.]

1. **Evidence**: VALUE OF GOODS DELIVERED : In an action based
   in part upon the fraudulent representations by the defendant as
   to the quality and value of goods sold and delivered, *held*, that
   evidence of the value of goods actually delivered was admissi-
   ble.

2. ———: PAROL CANNOT CONTRADICT WRITTEN.  A contract in
   writing having been declared on, and set out at length in the
   petition, which contained a clause providing that "All of said
   goods are to be selected by the said G. M. T.," defendant, evi-
   dence by parol to the effect that plaintiffs had contracted with
   G. M. T., defendant, for goods of a different fashion, make,
   style, and quality, from the goods actually selected by him,
   *held*, erroneously admitted.

3. ———: MUST AGREE WITH PLEADINGS: The rule of law is in-
   flexible that the allegations and the proof, *allegata et probata*,
   must agree.

ERROR to the district court for Lancaster county. Tried
below before FIELD, J.

*Webster & Holmes*, for plaintiff in error, cited, as to the
admissibility of evidence : *Dunbier v. Day*, 12 Neb., 600;
*High v. Mich. Bank*, 6 Id., 157 ; *Cropsey v. Averill*, 8 Id.,
158 ; *Hamilton v. Thrall*, 7 Id., 219 ; *Clark v. R. Co.*,
5 Id., 322 ; *Mills v. Miller*, 4 Id., 444; *Delamater v. Chap-
pel*, 48 Md., 251; *Knoblauch v. Kronschnabel*, 18 Minn,
307.

*Pound & Burr*, contra, cited : *Little v. Woodworth*, 8
Neb., 281 ; *Patrick v. Leach*, Id., 530 ; *Mayer v. Dean*,
115 N. Y., 556 ; *Briggs v. Hilton*, 99 Id., 517 ; *Chapin
v. Dobson*, 78 Id., 75 ; *Hall v. Erwin*, 66 Id., 649 ; *Mead
v. Bunn*, 32 Id., 275.

COBB, CH. J.

The plaintiffs below, on June 4, 1888, commenced this action in the district court of Lancaster county, alleging that on February 25, 1888, they entered into a contract with the defendant, as party of the first part, stating that he had sold to them goods, wares, and merchandise of certain quality, kinds, and amounts, mentioned in an inventory and Exhibit A at a cost of $13,768, to be furnished by the plaintiffs at the marked price and all to be selected by the defendant. The plaintiffs were to pay for cooperage and cartage on the goods, delivered at defendant's store in Lincoln, and to pay for all as follows: $5,000 in cash down, and $8,768 by the transfer of the following real estate: Lots 15 and 16 in block A, in Davidson's and Culver's addition to the town of Milford, in Seward county; also lot 3 in block 1 in Milford; also 640 acres of land in Cheyenne county, Nebraska, located sixteen miles south of Kimball, being the same sold to the plaintiff Schaefle by the Union Pacific Railroad Company; also twelve lots in the city of Hastings, block 22 in Loman's addition to said city; all of which the parties agreed to transfer, or cause to be transferred, to the defendant, free of all incumbrance whatever, except that of $672 on the land in Cheyenne county, $1,000 on the block of lots in Hastings, the interest on the same to be paid to the date of contract. The goods to be selected and delivered by defendant on or before February 27, 1888.

The following is a copy of the agreement herein referred to and of exhibit "A" thereto attached:

"Memorandum of agreement made and entered into this 23d day of February, 1888, by and between Geo. M. Traver, party of the first part, and B. F. Schaefle and R. M. Thompson, of Sutton, Nebraska, parties of the second part, witnesseth: The said party of the first part has this day bargained and sold to the said parties of the second

Traver v. Shaefle.

part, goods, wares, and merchandise of the quality, kinds, and of the amounts as is fully shown by annexed inventory hereto attached, marked exhibit 'A' and made a part hereof; the aggregate and total cost thereof being the sum of thirteen thousand and seven hundred and sixty-eight dollars ($13,-768.00), as also fully appears on the exhibit 'A.' Said goods to be furnished to said parties at the marked price thereof; all of said goods are to be selected by the said Geo. M. Traver. The said parties of the second part are to pay for all boxes and the cost of drayage. Said goods to be delivered at the store of Geo. M. Traver, in Lincoln, Nebraska. In payment of said amount and the cost of said goods, said parties of the second part hereby agree and bind themselves herein to make payment for the same as follows, to-wit: Five thousand dollars cash in hand at the date of this contract, and the balance of said amount to be paid, to-wit: The sum of $6,768.00 in the transfer and conveyance of the following described real estate by the parties of the second part to the said Geo. M. Traver. [Here follows the description of several parcels of real property.] That said goods are to be selected and delivered by the said Geo. M. Traver on or before the 27th day of February, 1888. All former contracts heretofore made by the parties hereto are hereby revoked and any suits at law now commenced by the said Traver shall be dismissed at once. In testimony whereof the said parties have hereunto set their hands this 25th day of February, 1888."

Signed and witnessed.

## " EXHIBIT 'A.'

| | | |
|---|---:|---:|
| Ginghams | $100 | 00 |
| Light brown muslin | 100 | 00 |
| Pillow case cotton and sheeting | 50 | 00 |
| Prints | 100 | 00 |
| Overalls, jumpers, coats | 100 | 00 |
| Cloaks and jerseys | 567 | 25 |
| Underwear | 400 | 00 |

Traver v. Shaefle.

| | | |
|---|---:|---:|
| Table oil cloth..................................... | $5 | 70 |
| Fans ............................................. | 125 | 00 |
| Scarfs, jackets, hoods, leggins, etc............... | 200 | 00 |
| Cottonades...................................... | 98 | 60 |
| Cassimeres and jeans............................. | 300 | 00 |
| Oil clothing and oil hats.......................... | 251 | 85 |
| Pipes............................................ | 175 | 00 |
| White goods department ......................... | 400 | 00 |
| Window curtains.................................. | 175 | 50 |
| Skirts........................................... | 76 | 77 |
| Velvets, brocades, farmers' satin and velveteen, | 600 | 00 |
| Hosiery ......................................... | 300 | 00 |
| Gloves .......................................... | 600 | 00 |
| Laces ........................................... | 200 | 00 |
| Embroideries and allovers ........................ | 200 | 00 |
| Wallets and purses............................... | 100 | 00 |
| Ladies' neckwear................................. | 100 | 00 |
| Dress and cloak trimmings........................ | 300 | 00 |
| Silks, satins, and surahs .......................... | 600 | 00 |
| Soaps........................................... | 100 | 00 |
| Jewelry ......................................... | 200 | 00 |
| Brushes......................................... | 100 | 00 |
| Linens .......................................... | 150 | 00 |
| Tabling and napkins ............................. | 150 | 00 |
| Draperies.. ..................................... | 100 | 00 |
| Flannels ........................................ | 1,000 | 00 |
| Dress goods, suitings, and cloakings ............. | 1,500 | 00 |
| White and colored cotton flannels ................ | 150 | 00 |
| Shawls.......................................... | 800 | 00 |
| Table spreads ................................... | 56 | 40 |
| Buttons ......................................... | 1,097 | 88 |
| Linings and facings .............................. | 300 | 00 |
| Notions and sundries ............................. | 500 | 00 |
| Bibs ............................................ | 100 | 00 |
| Gents' neckwear ................................. | 300 | 00 |
| Ladies' and gents' handkerchiefs ................. | 300 | 00 |

| | | |
|---|---|---|
| Ribbons...................................... | $400 | 00 |
| S. M. needles ................................ | 28 | 05 |
| Childrens' cotton cloakings, crashes, warp, duck, drills, shirt fronts, veilings, shoe blacking, corsets, silk mitts and mufflers, to amount of.................................... · | 200 | 00 |
| | $13,768 | 00 |

" If this bill is not in all respects just as the trade was made notify us at once, as no change of terms or prices will be allowed at time of settlement.

· (On the margin :)

" The foregoing inventory is the one referred to in said contract and hereby affirmed by us."

Signed by the plaintiffs.

The plaintiffs allege that they paid the defendant the sum of $5,000 cash, and fully complied with all the terms of their agreement, but that the defendant refused to deliver any of said goods, wares, and merchandise until the 16th day of March following.

2. The plaintiffs allege that on March 16, 1888, the defendant falsely, fraudulently, and knowingly represented that all and every of said goods were new goods, full pieces, and out of his regular wholesale stock, at his regular marked price, and none were out of remnants from his old " Trade Palace Stock," but were suitable for retail trade.

3. Relying on these representations, the plaintiffs made the exchange, upon the terms stated, and fully completed their agreement.

4. At the said 16th day of March the said goods, wares, and merchandise were not new goods, full pieces, nor out of his regular wholesale stock, nor invoiced at his regular marked prices, and were of his old "Trade Palace Stock," and were not suitable for a retail stock, and were of little or no value whatever, and the whole was not worth to ex-

ceed $2,000, all of which the defendant well knew; and as a condition of delivery, drew up and compelled the plaintiffs to sign the following:

"LINCOLN, Neb., March 16, 1888.

"In consideration of the acceptance of the bond tendered by B. F. Shaefle and R. M. Thompson, of Sutton, Nebraska, signed by Morey and McNaul, wherein it is covenanted and agreed to correct certain defects in the assignment of certain land located in Cheyenne county, Nebraska, and deliver the same to Geo. M. Traver, of Lincoln, or in case of failure herein to pay to said Traver the sum of $6 per acre therefor, and giving the said Shaefle and Thompson sixty days in which to perform said contract, it is expressly stipulated and agreed by the said Shaefle and Thompson that all demands of any nature whatsoever now existing against th. .iid Traver, if any, are hereby waived, receipted for, and settled in full, and that the goods sold by the said Traver, in consideration of the conveyance of the land in Cheyenne county, Neb., as stipulated in said bond and contract for the sale thereof, are hereby accepted as in accordance with the terms of said sale, and any and all defects, if any, are hereby waived, and all claims for damages, or of any nature, are hereby cancelled and receipted for, and said goods are hereby receipted for as delivered by the said Traver this day, and as being strictly in accordance with the terms and conditions of the contract."

The plaintiffs allege that, to induce them to sign the foregoing paper, the defendant made the fraudulent representations stated, and, believing them to be true, they signed the same and caused the goods, which had been boxed up by defendant, to be shipped to Sutton, Nebraska, where for the first time said frauds were discovered by plaintiffs.

5. That the whole amount of goods delivered were not worth to exceed $2,000, for which they had paid $13,768 in

cash, and exchange of all of said real estate, and they pray judgment for $11,768, with interest from March 16, 1888.

The defendant answered, denying each and every allegation of the plaintiffs.

2. On February 23, 1888, they had a certain transaction of barter, the terms of which are set forth in the plaintiffs' petition, and the invoice, and exhibit "A." During the four days defendant was engaged in selecting and packing the goods, the plaintiffs were during nearly all of the time present, assisting and assenting to the selections made, and prior thereto had been engaged in the examination of defendant's stock and were made acquainted with his price mark, and had examined into the prices of such goods, both before the making of the contract and during the selection of the goods. The contract was not consummated on the 27th of February, 1888, for the reason that the plaintiffs' title to the real estate was imperfect and incomplete; and afterwards, on March 16, they furnished defendant assurances for obtaining the title they were to convey to defendant, and the goods were then delivered to plaintiffs, and they receipted therefor, and made no complaint on that account. And defendant denies that he made, in respect to the sale of the goods, any other or different contract of sale than the barter heretofore set out, or that he has withheld any of said goods, or failed to furnish or deliver the same so bartered, or that they were of no more value than $2,000, and avers that he has kept and performed his said contract in all respects.

3. The defendant says that on March 16, having had dealings and barter with the plaintiffs, who, being unable to perform their part of said contract to make such conveyances as they had agreed to make, by reason of certain defects of title, which were supposed to be curable, asked for, and obtained, an extension of time in which to perform their contract, and then had a complete settlement of their mutual dealings, whereby they released and satisfied all

prior claims against defendant, if any they had, and the defendant then and there delivered to the plaintiffs the goods so sold, selected, and packed up in boxes, which were received by them before the execution of said contract, marked 'exhibit "B."

4. The defendant says that the plaintiffs are not the real parties in interest in this controversy; that they acted on behalf of their concealed principals, Thompson and Schwab, a copartnership firm at Sutton, Nebraska, who furnished all the property and money which constituted the consideration of said barter, and to whom, if to any one, the damage in this alleged action accrued, and not to the plaintiffs.

The plaintiffs replied, denying every allegation of the answer, except such as are hereinafter particularly admitted; that they did, on February 23, 1888, have a certain barter and sale, according to the terms of a written agreement of that date except as to description of property following the words "in Seward county, Nebraska," also lot No. 3, in block No. 1, in Milford, Seward county, Nebraska; and they deny that at that time, and as a part of the same transaction, there was annexed to said contract a certain exhibit therein referred to, and allege that defendant only made, executed and delivered to the plaintiffs a memorandum of agreement of said date, and like words as plead in said answer, signed in type writing, except some corrections made in ink by the hand of his attorney, E. P. Holmes, and no exhibit was given to plaintiffs nor attached thereto, and they say that the next day after the date of the contract plaintiffs paid to defendant $5,000 in cash, and all of said goods were boxed up ready for delivery, yet the defendant, in order to cheat, swindle, and defraud the plaintiffs, and to keep control and possession of said goods, in the absence of plaintiffs, to alter, change, and raise the price marks thereon, and to substitute large lots of worthless goods for those paid for by plaintiffs on February 24, 1888, withheld said exhibit "A," and only made

technical objections to said assignments of real property and the titles to said lots and lands, to carry out and assist him in keeping possession of said goods for thirty days or more after plaintiffs had paid him said $5,000.

The plaintiffs were at all times ready to perform their contract, except as to certain very technical points as to the assignments on the back of the contract for said.lands, which the defendant demanded should be corrected; and at his request longer time, until March 16, 1888, was had, and no settlement was had or thought of save on the part of defendant, who caused said release and satisfaction of all and every claim and demand to be made, and plaintiffs signed the same before they had any opportunity to examine the goods in the store and possession of defendant since the payment of said $5,000, and the exhibit " B " was delivered to defendant long before plaintiffs saw or accepted the goods, or had discovered the fraud set forth in their petition, and that it was a part of the scheme of defendant to obtain from them this exhibit " B," in order to better cover up said frauds and wrongs against them.

There was a trial to a jury, with verdict for the plaintiffs for $2,500. The defendant's motion for a new trial being overruled, judgment was entered on the verdict.

The case comes to this court upon petition in error, in which eight errors are assigned, to-wit:

1. Under the issues joined the court admitted evidence tending to show the value of the goods delivered by plaintiff herein to defendants to be given to the jury, to which the defendant at the time objected and excepted.

2. That the court permitted evidence of the oral representations, statements, and negotiations, antecedent to the contract of the plaintiff herein to the defendants, to be given to the jury, to vary a contract in writing of February 25, 1888, to which the plaintiff herein at the time objected and excepted.

3. The court permitted evidence to be given to the jury

of what goods were ordered, or ordered to be selected, under the contract by defendants herein, to which the plaintiff herein at the time objected and excepted.

4. The court erred in giving the instructions requested by defendants herein, Nos. 2, 4, and 7, to the giving of each of which the plaintiff herein objected and excepted at the time.

5. The court erred in giving to the jury each of the instructions given by the court, numbered respectively 5, 6, 8, and 11, to the giving of each of which the plaintiff herein objected and excepted.

6. The court erred in refusing to give to the jury each and every of the several instructions requested by the plaintiff herein to be given to the jury on his behalf, and numbered respectively 1, 2, 3, 4, 5, and 6, to the refusing to give each of which instructions severally the plaintiff herein at the time objected and excepted.

7. The court erred in overruling a motion for a new trial.

8. The verdict is not sustained by the evidence, the damages were excessive, and given under influence of passion or prejudice.

The first error assigned, which is also the first discussed by plaintiff in error in the brief, is, that the court admitted evidence tending to show the value of the goods delivered by the plaintiff in error to the defendants in error to be given to the jury. While the petition presents the case of the plaintiffs in a somewhat involved manner, difficult to be understood, we must take it to be an action for fraud and deceit in the sale of goods by the defendant to the plaintiffs, by which the plaintiffs claim to have been damaged in that, by the fraud and deceit of the defendant, he delivered to them and they received goods of an inferior quality and less value than those which he sold to them, and which, by virtue of the contract of sale and the consideration paid, they were entitled to receive. If this is a

fair construction of the object of the action, and the general nature and character of the petition, it follows that the quality and value of the goods actually received is a pertinent and necessary question for the consideration of the jury, without which no intelligent verdict could have been arrived at by them.

"In case of fraudulent representations of the quality or quantity of property sold, the general rule of damages is the difference between the value of the property as it is and what it would be worth if the representations had been true. This being the rule of damages, not only the representations of quality made by the vendor but also the actual value of the property must be given in evidence to the jury to enable them to apply the rule." See Field on Damages, section 706, and authorities there cited.

The second error presented in the petition in error, which is also considered under the first head in the brief of plaintiff in error, is, that the court erred in permitting oral representations, statements, and negotiations, antecedent to the contract of the plaintiff herein to the defendants, to be given to the jury, as counsel add, to vary a contract in writing of February 25, 1888. It is true, as may be seen by reference to the statement, that there was a written contract entered into between the plaintiffs and the defendant of the date stated in the exceptions, yet the alleged fraud and deceit relates to the making and procuring of said contract by the defendant and from the plaintiffs, as well as in the execution thereof.

I am somewhat at a loss to ascertain the true application of the evidence to this assignment as intended by counsel who write the brief. They do not designate in what part of the record this evidence is to be found, nor the witness who gave it; and when it is borne in mind that the bill of exceptions contains 319 pages, I trust that I may be pardoned if I overlook or fail to find some portion of it.

The plaintiff B. F. Shaefle, the first witness called by

the plaintiffs, being on the stand, was questioned as to the agreement of February 25; the delivery of the goods by the defendant; the payment of the sum of $5,000 by the plaintiffs; the shipping of the goods and other matters; in regard to the packing of the goods; where the goods were at that time; to what extent an inspection and examination of the goods was made by the plaintiffs; where the parties were when the contract was made; when and where the goods were packed; the situation, depth, and dimensions of the defendant's store.    None of these questions were objected to by counsel for defendant, except as to the depth of defendant's store and as to how many of the goods witness saw selected and packed into the boxes. This latter question was objected to as incompetent, immaterial, and irrelevant, and also objected to by the senior counsel for the defendant—"If the question goes to the value, it is irrelevant, and immaterial under the issues joined, and no foundation laid or the competency of the witness shown," which objection was overruled and defendant excepted.    Again, counsel objected to the question put to this witness by counsel for plaintiff: "Q. Did you see the goods they were putting in over ten or twelve boxes?"    And again, "Do you know whether he (Thompson) was present when any of the other boxes were packed?"    And again, counsel for the defendant objected to the question put to witness, "Who were they (the boxes of goods) addressed to?"

There were a great many other questions asked of this witness which were objected to and the objection overruled by the court, but I fail to find any which in my judgment come within the description of antecedent, oral negotiations of the parties leading to the contract.

R. M. Thompson, the other defendant, was also sworn and examined as a witness on behalf of the plaintiffs, but I fail to find, in his examination in chief, any question put to him by counsel for the plaintiffs which I conceive to

fall within the said description.    But I may be pardoned for saying that as soon as this witness was passed over to counsel for defendant, his examination became such as to render it open to the objection named, but as the plaintiffs are not complaining, no notice can be taken of this.

The plaintiff, B. F. Schaefle, being on the stand as a witness on behalf of the plaintiffs, and having been examined at considerable length as to the kind and quality of the goods taken out of the boxes after they were shipped to Sutton, his examination was continued as follows:

88. "What kind of buttons were they in these boxes?" A. "Six hundred and seventy-two gross of one kind of buttons.    It is a very cheap button and not very durable. They are worth"—Webster, "I object."    Burr, "I will ask him a question."

89. "Were you acquainted with the cash value of buttons at that time?"    A. "Yes."

90. "State what these buttons were worth upon the market at that time?"    Webster, "I object.    Immaterial and irrelevant under the issues.    There being no attempt made to show that they were not selected by Traver at the marked price of his stock, and if they were, the value is immaterial."    Overruled, etc.    A. "They were worth, such a lot as that, taking them all together, six hundred and seventy-two gross, would sell for about seven cents a gross."

91. "What were they charged to you at in this bill?" A. "If my memory serves me right, I think thirty-five cents, but you will find it in the inventory."

92. "State what kind of buttons you ordered of Mr. Traver?"    A. "I bargained for an assortment of buttons." Holmes, "I object, as immaterial under the issues.    The pleadings show that Mr. Traver was to select these goods, and to select the buttons, it not being specified what kind of buttons were to be selected."    Overruled, etc.    A. "O, not more than four or five gross of a kind, and they were buttons that were in style and salable, and that were good

value at the prices he quoted to us at the time we made the contract."

93. "What kind of buttons did he show you at the time you made the contract?" A. "He showed us these buttons—just specimens on his shelves in open sight—fairly in sight to be seen, but buttons he gave us I never saw before, and consequently he didn't give us the buttons we ordered."

94. "How many classes and styles did you examine in his presence?" A. "I didn't count them, but probably two hundred or two hundred and fifty different kinds."

95. "What kind of buttons did you receive?" A. "I got one lot of buttons, six hundred and seventy-two gross of that one kind and quality, and outside of that I received a lot of high-priced buttons that were entirely out of style and not salable. Some were as high as a dollar and a half a dozen, and some were as high as two dollars a dozen," etc.

96. "Look at that inventory—you take the items called ginghams and go through that, and tell what kind of ginghams you ordered, and what kind you received?" Holmes, "I object, as incompetent and immaterial under the issues. The contract as plead here shows that Mr. Traver had a right to select these goods, and no particular nor special kind were ordered." Overruled. A. "The ginghams, as far as this invoice shows, are all right, with the exception of a great many remnants in the line of French ginghams, and he charged us fifteen cents a yard for them."

97. "What was said, or what was agreed between Traver and you about remnants—what were the statements made by him to you?" A. "The statements were these, that he was to give us"—Holmes objected, as irrelevant, immaterial, and incompetent. Overruled and answer continued—"goods out of his wholesale stock, and it stands to reason that there would not be any remnants in a whole-

sale stock, and they were to be new goods given us, and there were probably all the remnants he had in the house."

A decision of the questions presented in the above objections to testimony and rulings of the court thereon will probably be decisive of the case.

The petition, instead of alleging the amount, value, kind, and quality of the goods purchased, the direct terms, refers to the agreement in writing between the plaintiffs and defendant on the 23d day of February, 1888. The written agreement refers to the annexed inventory "marked exhibit 'A' and made a part hereof." Looking at the contract and the inventory together, the natural and irresistible inference would be that the goods included therein consisted of aggregated and clearly defined and designated blocks of goods already set apart and well known to the parties, were it not for the clause of the contract, that "All of said goods are to be selected by the said Geo. M. Traver." But giving these words their due meaning and weight, it becomes apparent, and the conclusion follows, that some larger stock or body of goods, embracing goods of the kinds and descriptions named in the inventory, was in the view of the parties in entering into the said contract, out of which the goods contracted for were to be selected by the seller, Traver. The first clause of the contract speaks of the "quality, kinds, and the amounts of the goods as fully shown by the annexed inventory," but when we turn to the inventory, we fail to find anything whatever as to the quality of the goods. For example, the two articles of "ginghams" and "buttons," about which the evidence above quoted was given. These articles are distinguished from other goods only by the use of the most general words. What was the purpose of this so-called inventory? Doubtless it was to limit and control Traver in the selection of the thirteen thousand seven hundred and sixty-eight dollars' worth of goods. Otherwise the entire purchase might, within the letter of the contract, have con-

38

sisted of buttons. But the question is, having by the words of the contract, including, of course, the inventory, limited Traver in the selection of the goods to " Buttons, $1,097.88," and " Ginghams, $100," with no other words signifying kind, quality, pattern, make, size, or material, can the plaintiffs now by parol limit him to the selection of a varied stock of buttons, and to a hundred dollars' worth of ginghams consisting of entire bolts? This cannot be done without importing words and sentences into the written contract. But if this could be done, surely it would have to be by appropriate allegations of pleading. Here there is no attempt to declare on the contract by its legal effect, nor to construe it by the light of antecedent or contemporaneous facts or circumstances, and the words of the contract, as declared and exhibited, place no limitation of quality, style, or fashion upon the articles of goods to be selected.

There is no allegation in the petition that the plaintiffs ordered goods of the defendant; nor of any contractual or other relations between the parties giving them the right to choose, select, or order particular goods, nor a particular quality, make, style, or fashion of goods, and by such choice, selection, or order, make it the duty of the defendant to deliver such goods or articles.

I am therefore of the opinion that the court erred in overruling the defendant's objections and admitting testimony as to the kind and quality of buttons and ginghams ordered by the plaintiffs of the defendant, etc. These exceptions are a fair sample of those running throughout the record of the case. They are not only of the class of prejudicial errors, but clearly indicate that both the pleadings and trial of the case proceeded upon a false theory. The evidence contained in the record tends to prove, more or less definitely, that the defendant had been for a number of years carrying on a wholesale and retail dry goods business; that he had on hand in his store a large stock of dry

goods and notions, part of which consisted of bright, fresh, fashionable, and stylish goods, suitable for the wholesale trade, and part of which were old-fashioned, shelf-worn, and soiled remnants and broken packages. That he so arranged these goods in the several departments and upon the shelves of his store that a person making an ordinary examination and inspection of the stock would see only the best and desirable goods, the uncut bolts and the entire and unsoiled packages. That the cut bolts, remnants, old style and antiquated pieces, broken and soiled packages, and unsalable goods were covered up and concealed from view. That the best and exhibited goods were marked with a private sale mark, at fair and reasonable prices, respectively; that having by a tempting advertisement induced the plaintiffs to visit his store with the view of making a large purchase of goods, paying therefor partly in cash and partly in real property, as invited by the said advertisement, he took them through his store, calling their attention and giving them time and opportunity only to examine and inspect the fresh goods, uncut bolts, and unbroken and unsoiled packages, calling their attention to the marked sale prices of these and giving them the key to the private mark; that by the above means, and after several hitches in the negotiations, the defendant induced the plaintiffs to enter into and to execute the contract set out in the statement; that thereupon, taking advantage of the clause of the contract providing that the goods should be selected by him, the defendant selected, boxed, and shipped to the plaintiffs, or to their order, goods of the nominal or marked value stated in the contract, in great part out of the old style, unfashionable goods, remnants, and broken and soiled packages, which, though doubtless in the store at the time of the inspection of the stock by the plaintiffs, had not been seen nor examined by them, but had been concealed from them, and most of the articles had been marked far above their value

and far above the rate at which the superior goods examined by plaintiffs of the same general class were marked.

Had there been allegations of pleading in the plaintiffs' petition sufficient to make this evidence admissible, I think a case for judgment would be made on the part of the plaintiffs against the defendant; but there is no more inflexible rule of law than that, to sustain a verdict or judgment, the pleadings and the proof, *allegata et probata,* must agree.

As there must be a new trial it is not deemed necessary to pass upon the other errors assigned. The judgment of the district court is reversed and the cause remanded to that court for further proceedings, with permission of the plaintiffs to amend their petition, if so advised.

JUDGMENT ACCORDINGLY.

THE other judges concur.