STACY HENSLEY, APPELLEE, V. CHICAGO, ST. PAUL, MINNEA-POLIS & OMAHA RAILWAY COMPANY, APPELLANT.

FILED JULY 2, 1929. No. 26379.

*Wymer Dressler* and *Robert D. Neely*, for appellant.

*M. F. Harrington* and *George M. Harrington, contra.*

Heard before ROSE, DEAN, GOOD, EBERLY and DAY, JJ., and RAPER and REDICK, District Judges.

GOOD, J.

This action was brought under the federal employers' liability act, to recover damages for personal injuries alleged to have been sustained by plaintiff while working for defendant as a section laborer. Plaintiff recovered a judgment for $14,000. Defendant appeals.

Of the many assignments of error, we shall consider only such as seem necessary to a proper determination of the cause.

From the record it appears that the defendant operates a system of railways, extending into and through a num-

ber of states. Plaintiff had been employed for a number of years by the defendant as a section laborer. His duties as such required him to work over and on a limited portion of defendant's right of way, in keeping its railway tracks in proper condition for both interstate and intrastate traffic. It appears that over the various branches of defendant's right of way repairs are made from time to time, and that when such repairs are made there are removed, as unfit for use, bolts, nuts, angle bars, base plates, parts of rails and other iron and steel material. This rejected material will hereinafter be referred to as "scrap." It was collected in small quantities at various places along the right of way of the several branches of defendant's railway. From time to time this scrap was gathered up and loaded onto cars and transported to Emerson, Nebraska, where it was unloaded upon a storage platform. When, from the various branch lines of railway, a sufficient quantity of scrap had been accumulated upon the platform to make approximately a carload, it was reloaded into a car and shipped to Hudson, Wisconsin, where defendant maintained shops and where the scrap was used in its business. Plaintiff in this case had nothing to do with the gathering of the scrap and loading it onto the cars for transportation to Emerson.

Some four or five days before the injury of which plaintiff complains, two cars, containing scrap which had been gathered up along the line, had been placed on a switch at Emerson adjacent to the storage platform. One of these cars was a flat-car and the other what is known as a gondola car. The flat-car was equipped with a collapsible or disappearing brake; that is, one in which the brake shaft operates in a sleeve or drum and, by a mechanical device, the brake shaft may be lowered through the sleeve or drum until the brake wheel is flush with the floor of the flat-car. The brake end of the flat-car was next to the gondola car.

On the morning of the day that plaintiff was injured, when he went to his place of employment, he, with the other

members of the section crew, was ordered to assist a yard crew in unloading the scrap from the two cars. They had unloaded the major portion of the scrap from the flat-car when plaintiff stepped upon the brake wheel on the flat-car for the purpose of seeing the nature of the material in the gondola car. The brake shaft descended through the sleeve, and plaintiff was thrown between the two cars and received the injury of which he complains.

Defendant argues that there is no evidence which supports any act of alleged negligence. Plaintiff alleged that it was a common practice for the train employees to sit upon the brake wheel and ride thereon; that when plaintiff got upon the brake wheel he believed it to be strong and in a proper state of repair, but that, in fact, the brake was worn, loose and unsafe, which was unknown to plaintiff. He alleged that he got upon said brake wheel carefully and with due regard to and in the line of his duty as a section hand, *as prescribed by defendant,* for the purpose of ascertaining what tools would be needed for unloading the scrap from the gondola car. There is some evidence tending to show that the brake shaft was not perpendicular, that it was rusted and somewhat worn, but there is no evidence to show, nor any from which it might be properly inferred, that the brake was not in a proper condition to be used as a brake, or that it would not operate properly and safely for the purpose for which it was designed. However, plaintiff testified that he was ordered by his foreman to climb upon the brake wheel for the purpose of seeing into the gondola car, and that, pursuant to the order, he stepped upon the brake wheel.

It may be seriously doubted whether this evidence was properly admissible under the facts as pleaded, but the evidence was received without objection and without any motion to strike it from the record. Defendant, in turn, introduced evidence tending to contradict that given by plaintiff, and tending to prove that no such order was given and that plaintiff acted voluntarily and out of curiosity in climbing upon the brake. Under the circumstances,

it is evident that, for the purposes of the trial, both parties treated the allegations of the petition as sufficient to admit evidence of the order, requiring plaintiff to climb upon the brake and into a place of danger that was unknown to him, and as a consequence he was injured.

Defendant invokes the rule that the allegations of the pleadings and proof thereunder must agree. This rule has often been anounced in this court and is no doubt a sound one. *Clarke v. Omaha & S. W. R. Co.*, 5 Neb. 314; *Traver v. Shaefle*, 33 Neb. 531; *Ayers v. Wolcott*, 66 Neb. 712; *Cockins v. Bank of Alma*, 84 Neb. 624; *Boyd v. Lincoln & N. W. R. Co.*, 89 Neb. 840. To this rule there are well-recognized exceptions, one of which is that if an issue is tried by both parties, without objection from either that the issue is not sufficiently pleaded, such objection will not be considered in the appellate court as a ground for reversal. *Boyd v. Lincoln & N. W. R. Co., supra; Sjogren v. Clark*, 106 Neb. 600; *Auld v. Walker*, 107 Neb. 676.

Defendant contends that, since there were several obviously safe ways by which plaintiff could have seen into the gondola car, and since it was so plainly perilous for one to climb and stand upon the brake wheel when there was no necessity therefor, it is silly and unreasonable to believe that such an order should be given, and that testimony that it was so given is unworthy of credence. It may seem improbable that such an order would be given under the circumstances. It is a matter of common knowledge that unreasonable and absurd orders are sometimes given to workmen by their foremen. Whether such an order was given to plaintiff presented a question of fact for the jury to determine.

Defendant urges that the evidence shows plaintiff was not engaged in interstate commerce when he was injured, and that no recovery may be had in this action brought under and based upon the federal employers' liability act.

Since the legislation is federal, the interpretation placed upon it by the federal courts is controlling. The United States supreme court has many times held that the test

of whether the employee was subject to the act is: Was the employee, at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it? This principle has been so frequently announced and adhered to that no citation of authorities seems necessary. While the principle is plain, its application to a particular state of facts is not always easy.

There have been many decisions by the United States supreme court, as well as the courts of other jurisdictions, which shed light upon what facts or class of facts will bring an employee within the protection of the federal employers' liability act, a number of which cases we will now proceed to examine and discuss.

In *Philadelphia & R. R. Co. v. Di Donato*, 256 U. S. 327, it was held that a person, employed as a railway flagman at a public crossing to signal both interstate and intrastate trains, was, without regard to the character—intrastate or interstate—of the particular train which he was flagging when killed, engaged in interstate commerce, within the meaning of the federal employers' liability act. In the opinion it was observed that the duty of the flagman was not only to flag trains, but to see that the track was kept clear and in proper condition for the passage of both interstate and intrastate trains, and for that reason his employment was held to be in interstate commerce.

In *Erie R. Co. v. Collins*, 253 U. S. 77, it was held: "Plaintiff's duties on a railroad engaged in interstate and intrastate commerce were to attend to a signal tower and switches and also, in a nearby building, to run a gasoline engine to pump water into a tank for the use of the locomotives, whether operating intrastate or interstate trains. While engaged in the latter employment, he was injured and disfigured by burns resulting from an explosion of gasoline. *Held,* employed, at time of injury, in interstate commerce, within the federal employers' liability act."

In *Erie R. Co. v. Szary*, 253 U. S. 86, it was held: "An employee of a railroad engaged in both interstate and in-

trastate commerce, whose duty it was to dry sand in stoves in a small structure near the tracks and supply it to the locomotives, whether operating in the one kind of commerce or the other, was injured while returning from an ash-pit whither he had gone to dump ashes taken by him from one of the stoves after sanding several locomotives bound to other states. *Held,* employed in interstate commerce within the meaning of the federal employers' liability act."

In *Philadelphia, B. & W. R. Co. v. Smith,* 250 U. S. 101, it was held: "An employee of an interstate railroad whose duties were to cook the meals, make the beds, etc., for a gang of bridge carpenters, in a camp car which was provided and moved from place to place along the railroad line to facilitate their work in repairing the bridges, and who, at the time of his injury, was within the car, on a sidetrack, and occupied in cooking a meal for the carpenters and himself while they were repairing one of the bridges in the vicinity, *held,* engaged in interstate commerce, within the meaning of the federal employers' liability act." In the body of the opinion it was said: "The significant thing, in our opinion, is that he was employed by defendant to assist, and actually was assisting, the work of the bridge carpenters by keeping their bed and board close to their place of work, thus rendering it easier for defendant to maintain a proper organization of the bridge gang, and forwarding their work by reducing the time lost in going to and from their meals and their lodging place. If, instead, he had brought their meals to them daily at the bridge upon which they happened to be working, it hardly would be questioned that his work in so doing was a part of theirs. What he was in fact doing was the same in kind, and did not differ materially in degree. Hence, he was employed, as they were, in interstate commerce, within the meaning of the employers' liability act."

In *Pedersen v. Delaware, L. & W. R. Co.,* 229 U. S. 146, it was held: "One carrying materials to be used in repairing an instrumentality of interstate commerce is

engaged in such commerce; and so *held,* that a railroad employee carrying bolts to be used in repairing an interstate railroad and who was injured by an interstate train is entitled to sue under the employers' liability act of 1908."

In *Kibler v. Davis,* 109 Neb. 837, this court held: "Where one is engaged in shoveling coal into a pit, to be elevated by machinery into a coal chute for immediate use in engines, used in both interstate and intrastate traffic, he is engaged in a work so closely related to interstate transportation as to be a part of it, and is within the protection of the federal employers' liability act."

These cases serve to illustrate to what extent the principle above quoted is applied in holding that employees are engaged in interstate commerce, or work so closely related thereto as to be a part thereof.

In *Minneapolis & St. L. R. Co. v. Winters,* 242 U. S. 353, it was held: "The injury occurred while plaintiff was repairing an engine. The engine had been used in interstate commerce before the injury and was so used afterwards, but there was nothing to show that it was permanently or specially devoted to such commerce, or assigned to it at the time. *Held,* not a case within the federal employers' liability act." In that case it appeared that the injuries occurred on October 21; that the last time the engine was used before the injury was on October 18, and that it was used again after the injury on October 21. In the opinion it was pointed out that an engine, as such, was not permanently devoted to any kind of traffic, and it did not appear that the engine in that case was destined especially to anything more definite than such business as it might be needed for. At the time the repairs were being made upon it, it was engaged in neither interstate nor intrastate traffic. Its character as an instrument of commerce depended on its employment at the time, and not upon remote possibilities or accidental later events.

In *Shanks v. Delaware, L. & W. R. Co.,* 239 U. S. 556, it was held: "Where a railroad company, which is engaged in both interstate and intrastate transportation, con-

ducts a machine shop for repairing locomotives used in such transportation, an employee is not engaged in interstate commerce while taking down and putting up fixtures in such machine shop, and cannot, if injured while so doing, maintain an action under the employers' liability act, even though on other occasions his employment relates to interstate commerce." In the course of the opinion it was said:

"Having in mind the nature and usual course of the business to which the act relates and the evident purpose of congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a ' practical one better suited to the occasion, * * * and that the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it. * * *

"Without departing from this test, we also have held that the requisite employment in interstate commerce does not exist where a member of a switching crew, whose general work extends to both interstate and intrastate traffic, is engaged in hauling a train or drag of cars, all loaded with intrastate freight, from one part of a city to another, * * * and where an employee in a colliery operated by a railroad company is mining coal intended to be used in the company's locomotives moving in interstate commerce. * * * In neither instance could the service indicated be said to be interstate transportation or so closely related to it as to be practically a part of it.

"Coming to apply the test to the case in hand, it is plain that Shanks was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car or other instrument then in use in such transportation. What he was doing was altering the location of a fixture in a machine shop. The connection between the fixture and interstate transportation was remote at best, for the only function of the fixture was to communicate power to machinery used in repair-

ing parts of engines some of which were used in such transportation."

In *Chicago, B. & Q. R. Co. v. Harrington,* 241 U. S. 177, it was held: "An employee of a carrier engaged in removing coal from storage tracks to coal chutes is not engaged in interstate commerce, even though the coal had been previously brought from another state and was to be used by locomotives in interstate hauls."

In *Shauberger v. Erie R. Co.,* 25 Fed. (2d) 297, it was held: "Engineer of switching engine, injured while distributing cars in the yard, none of which were shown to be in use in interstate commerce, *held* not employed in such commerce within federal employers' liability act." It appears that some of the cars being switched had been brought in from other states, and that some of the cars were later destined for interstate shipment, but it was noted in the opinion that at the particular time neither the engine nor the cars were engaged in interstate commerce.

This court, in *James v. Chicago & N. W. R. Co.,* 115 Neb. 164, in an opinion by Eberly, J., held:

"The test of the employment and the application of the federal employers' liability act is: 'Was the employee, at the time of the injury, engaged in interstate transportation, or any work so closely related to it as to be practically a part of it?'

"The test of jurisdiction in repair cases is whether the rolling stock, engine, or car is withdrawn from service at the time the repairs are made, as distinguished from being interrupted in the course of an interstate haul to go on.

"A machinist's helper, under the facts in this record, injured, while making repairs in the roundhouse, upon an engine which had been used in hauling over the railway company's lines freight trains carrying both intrastate and interstate freight, and which was used in the same way after the accident, was not then employed in interstate commerce within the meaning of the federal employers' liability act of April 22, 1908, governing the liability of an

interstate carrier for injuries to its employees when em-
ployed in interstate commerce."

Generally speaking, it may be said that the federal courts
hold that a railway employee, who is engaged in main-
taining or repairing a railway track that is used for carry-
ing both interstate and intrastate freight, is within the
protection of the statute; also that any employee who is
engaged in operating a train that is carrying interstate
freight and all those who may be engaged in repairing a
car or an engine that is, at the time of repair, being used
in interstate traffic are within the protection of the fed-
eral employers' liability act. On the other hand, those
railway employees who are engaged in working upon any
instrumentality that is not, at the time, engaged or being
used in interstate traffic are generally without the statute.

In the instant case, the scrap that was being unloaded
from the cars was not being used for the purpose of aid-
ing or in any manner furthering interstate traffic; nor
does it appear that it was intended to be thereafter so used.
It was scrap which undoubtedly required many independ-
ent kinds of treatment before it could be put to such use,
and, therefore, the mere unloading of it was a factor too
remote to meet the requirements of close connection with
interstate commerce. *Malandrino v. Southern N. Y. P. &
R. Corporation,* 190 App. Div. (N. Y.) 780. Transportation,
wholly intrastate, had ended; the unloading was the com-
pleting act, and interstate transportation did not begin until
the scrap was again loaded. The final shipment to Hudson,
Wisconsin, was a matter resting only in the railroad com-
pany's intention, which it might or might not carry out.
When the scrap had been hauled into the town of Emer-
son it had wholly ceased any function in connection with
interstate traffic. The unloading thereof from the car
onto the platform for storage purposes was a work that
had no connection with interstate transportation. Such
transportation could be carried on just as well whether
or not the scrap was unloaded, and, therefore, the opera-
tion in which plaintiff was engaged did not assist in any

manner transportation, intrastate or interstate. *Perez v. Union P. R. Co.,* 52 Utah, 286. See, also, *Cincinnati, N. O. & T. P. R. Co. v. Hansford,* 173 Ky. 126.

. We are constrained to hold that, under the circumstances, plaintiff was not engaged in interstate commerce, within the meaning of the federal employers' liability act. It necessarily follows that the action, based on that act, cannot be maintained.

Counsel for plaintiff contend that the allegations of the petition and the evidence are sufficient to sustain a common-law action for negligence, and that the judgment should, therefore, be affirmed. We are confronted, however, with the proposition that the rules of law and the defenses in an action arising under the federal employers' liability act and in a common-law action for negligence are not the same. Under the federal employers' liability act certain defenses which might be urged in a common-law action are eliminated. Again, in a common-law action for negligence, under the statutes of this state, the rule of comparative negligence obtains. Under the federal employers' liability act contributory negligence is not a defense, but only goes to the extent of mitigating the amount of recovery, while under the Nebraska statute contributory negligence is a complete defense, unless the negligence of the defendant is gross and the contributory negligence of the plaintiff is slight in comparison therewith. The same instructions are not applicable to the two classes of cases. In the instant case, plaintiff alleged facts in his petition which would bring him within the protection of the federal employers' liability act, and it was upon that theory that his case was tried and submitted to the jury. He must either stand or fall upon the proposition that he is entitled to recover under that act.

In *James v. Chicago & N. W. R. Co.,* 115 Neb. 164, there were originally two causes of action or two cases consolidated. It was contended by plaintiff that one of the causes of action was under the federal employers' liability act and the other was not, and for that reason the judgment

should not be reversed. Upon this proposition, in the opinion Eberly, J., said (page 173):

"It is to be noted further that the federal employers' liability act by its terms eliminates certain defenses that exist at common law, and qualifies others. To concede plaintiff's contention would be to permit him to take advantage of the benefit of these provisions in an action to which the law itself did not apply. This court cannot say that, deprived of the advantage which the federal employers' liability act confers, the plaintiff would have prevailed in the trial had in the district court. For, indeed, not only the issues, but the proof, might well have been quite different. It follows, therefore, that for the purposes of this case the plaintiff must stand or fall on the basis which he himself determined for the bringing of his lawsuit."

The conclusion which we have reached upon the proposition under discussion renders it unnecessary to consider the other errors assigned. Since the action was brought under and based upon a right to recover under the federal employers' liability act and the evidence is insufficient to show that plaintiff was engaged in either interstate transportation or in work so closely related thereto as to be a part thereof, it follows that the judgment cannot be sustained.

The judgment of the district court is reversed and the cause remanded to the district court for further proceedings consistent with this opinion.

REVERSED.

DEAN, J., dissenting.

At the time of the accident the plaintiff, a day laborer, was working under the immediate direction of Reuben Groves, a section foreman, and was then engaged in shoveling scrap iron from a flat-car onto a platform at Emerson. The foreman was on the flat-car at the time and, referring to a gondola car which was coupled to the flat-car, he gave plaintiff this order: "Get up on the brake and see what is in the (gondola) car." In obedience to his

foreman's order, the plaintiff testified: "I got up with my left foot and stood on the (flat-car) brake with my left foot. I started to raise my other foot and the brake went down. I fell between those two cars." It was then and there that plaintiff sustained his injuries. It may here be noted that the end frame of the gondola car was so high that a man, standing on the flat-car, could not see over it into the car ahead; hence, the order to plaintiff, from his superior, to "get up on the brake." The foreman denied that he told plaintiff to look into the gondola car and see what was there. But this question of disputed fact was for the jury. The foreman, however, testified: "Q. As a matter of fact, can't you see into the gondola without climbing up anything? A. No, you couldn't." In this he corroborated an important statement in plaintiff's evidence.

In respect of his condition immediately following the accident, plaintiff testified that his injured leg was treated by the defendant's local physician and that he was bedfast three weeks at his home and was then removed to a Sioux City hospital where he remained eleven days. From thence plaintiff returned to his home, but later his injury was such that he was again sent to the hospital for treatment and, for the space of four months, he was compelled to use crutches. But there was an intervening period of 15 or 20 days when he could not use a crutch. He testified: "I didn't have any strength in my hands for a cane and I was so sore that I couldn't be touched by my crutches." Plaintiff went twice to a mud bath health resort but obtained no relief. He testified: "I was weak, in bad shape. * * * I was in bed part of the time and up part of the time."

The present case differs materially from the cases cited by defendant in that plaintiff Hensley did not voluntarily place himself in a dangerous position. He mounted the brake wheel because he was imperatively ordered to do so by his superior, one of defendant's employees, under whose orders the plaintiff worked. And in the eight or

ten cases cited in the main opinion it is not made to appear that the injured railway employees, therein said to have suffered injuries, so suffered from the fact that they were ordered into a place of danger. So far as the quoted language of the cited opinions discloses the employees there were injured by accidents that did not arise out of an order from a foreman to do certain specified work, as in the present case.

It is argued in the main opinion that plaintiff "selected" a dangerous way of obeying the command of his boss. But plaintiff made no selection. The foreman made the selection and he, as defendant's representative, and in its place, gave the imperative command that led instantly to the calamitous result in question here.

Quoting from the main opinion: "Defendant contends that, since there were several obviously safe ways by which plaintiff could have seen into the gondola car, and since it was so plainly perilous for one to climb and stand upon the brake wheel when there was no necessity therefor, it is silly and unreasonable to believe that such an order should be given, and that testimony that it was so given is unworthy of credence." And the argument in the opinion concludes: "Whether such an order was given to plaintiff presented a question of fact for the jury to determine."

The above conclusion is elementary. Nothing affecting trial practice in this jurisdiction is better settled than that, in a case tried to a jury, it is, of course, the office of the jury, and not that of the court, to determine controverted questions of material fact when presented under the recognized rules of practice. This function, for time out of mind, has so rested within the province of the jury in Anglo-Saxon jurisprudence. And the jury believed the plaintiff's statement and refused to accept that of the opposing party. It is the big point in the case. In the class of repair work in which plaintiff was engaged, the order of the immediate superior must be promptly obeyed by the subordinate. It is not his to reason why. It is his to obey and that promptly. This is clearly the vital point

before us here. The trial court and the jury having seen and having heard the witnesses and having observed their demeanor while testifying were thereby better enabled to judge of the truth or the falsity of the witnesses, and their fairness or the lack of it, than any reviewing court.

From the facts and under the law applicable thereto, I respectfully submit that the verdict of the jury and the judgment rendered thereon by the learned trial court should be affirmed.

Note—See Commerce, 12 C. J. 44 n. 15, 46 n. 23; 47 L. R. A. n. s. 55; L. R. A. 1915C, 62; L. R. A. 1918E, 859; 10 A. L. R. 1184; 14 A. L. R. 732; 24 A. L. R. 635; 49 A. L. R. 1342; 18 R. C. L. 850; 3 R. C. L. Supp. 861; 4 R. C. L. Supp. 1216; 5 R. C. L. Supp. 1007; 6 R. C. L. Supp. 1091; 6 R. C. L. Supp. 612.